**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| BRIAN M. HAYES, BRIAN M. HAYES II, and BRIAN M. HAYES & ASSOCIATES, INC.<br><br>                              Plaintiffs,<br><br>        v.<br><br>OHIO NATIONAL FINANCIAL SERVICES, INC., and THE O.N. EQUITY SALES COMPANY,<br><br>                              Defendants | CIVIL ACTION<br><br>No. 08-3743 |

Pollak, J.

August 12, 2009

## OPINION

Plaintiffs Brian M. Hayes ("Hayes") and Brian M. Hayes II ("Hayes II") were

insurance salesmen who, while working for Brian M. Hayes & Associates (the

"Agency"),  sold and serviced insurance policies on behalf of the defendants, Ohio

National Financial Services, Inc. ("Ohio National") and its wholly owned subsidiary, the

O.N. Equity Sales Company ("ONESCO").  Since the end of the business relationship

between plaintiffs and defendants, the parties have disputed their respective rights to

access and use the customer information of policies that were sold and/or serviced by

1

plaintiffs.

After the parties resolved any issues of preliminary injunctive relief by entering into a partial settlement agreement (*see* Docket No. 25, filed September 12, 2008), they sought a final determination from this court, sitting in diversity, as to the rights of the parties.  Accordingly, the litigants appeared before this court for a hearing, at which the parties had the opportunity to put on witnesses and enter evidence into the record.[1]  A final determination by this court of these issues, taking into account the evidence presented, requires this court to "find the facts specially and state separately its conclusions of law thereon."  *See* Fed. R. Civ. P. 52(a).  Thus, in this opinion I first find facts, and then state my conclusions of law.

## I.  Findings of Fact

On or about April 16, 1992, Ohio National and Hayes entered into a General Agent Contract (the "Old Contract"), and on or about February 17, 1995, Hayes and ONESCO entered into a Registered Representative Agreement (the "Rep. Agreement").  Pl. Proposed Findings at ¶¶ 7-8 (Docket No. 46, filed May 26, 2009).  On or about January 1, 1998, Hayes and Ohio National entered into a new General Agent Contract (the "G.A. Contract"), which superceded the Old Contract.  *Id.* at ¶ 9.  Hayes assigned the G.A. Contract to the Agency.  *Id.* at ¶ 17.  Hayes II, meanwhile, signed a Career Agent

---

[1] The hearing began on March 26, 2009, and was adjourned, but not concluded, at the end of that day.  It resumed, and concluded, on May 26, 2009.

Agreement (the "C.A. Contract") with Ohio National in 2005.

Pursuant to the G.A. Contract, Hayes represented Ohio National as an agent, selling and servicing its insurance policies and recruiting other agents and brokers to represent Ohio National. *Id.* at ¶ 10-11. Ohio National also provided additional policyholders – culled from its terminated, resigning, and/or retiring agents – to Hayes for servicing; these reassigned policyholders were known as "orphans." *See* Def. Proposed Findings ¶ 8 (Docket No. 49, filed June 1, 2009). Hayes was compensated for servicing approximately 2,500 of these policies, and although he was not their original salesman, he was also able to sell new policies to his orphan clients. *Id.* at ¶¶ 9-10, 34-37. Although Hayes was not an exclusive agent of Ohio National, Hayes "placed 99.9 percent of [his] contracts with Ohio National." Tr. of March 26, 2009 Hearing at p. 25 (Docket No. 43, filed April 14, 2009).

Ohio National is a mutual insurance company, meaning that the company is owned by its policyholders. *Id.* at ¶¶ 113-115 . The Ohio National policies of insurance were non-cancellable life and disability insurance policies, as well as annuities. *Id.* at ¶¶ 109, 111.

At the center of this litigation is Section 4.03 of the G.A. Contract (which is the same, verbatim, as Section 8.05 of the C.A. Contract), entitled "Effect of Termination." It provides:

> Upon termination of this Contract, the General Agent's authority
> and duties shall cease. The General Agent shall then make a

3

> final report and shall turn over to the Company all monies,
> receipts, notes, reports, policyowner records, books, stationery,
> blanks, forms, computer disks and software of any kind and any
> other property of the Company which the General Agent then or
> thereafter possesses or controls.

Def. Exh. C (the G.A. Contract); Def. Exh. F. (the C.A. Contract).[2]  While Section 4.03 of

the G.A. Contract relates to policyowner information, nowhere do any of the contracts

reference the term "expirations."  *See* Def. Proposed Findings ¶ 44.

The contracts mention no instance in which the policyowner information, such as

that discussed in Section 4.03 of the G.A. Contract or Section 8.05 of the C.A. Contract,

vests in the agent, i.e., Hayes or Hayes II.  Hayes, however, testified to the court that he

was told, by a representative of defendants, that "it's twenty percent a year vesting, that at

the end of five years [the agent] own[s] the business. . . the policyholders and the

business."  *See* Tr. of March 26, 2009 Hearing at 107 (Docket No. 43, filed April 14,

2009).  Hayes clarified, however, that in his alleged conversations with defendants'

representative, he never inquired what effect termination might have on the alleged

vesting plan, or on possession of particular policyholder information.  *Id.* at 108.  Hayes

did contend that the vesting plan he testified to was "in the marketing material" that

defendants provided to prospective agents, *id.*, but he did not provide the court with any

such materials.  Accordingly, I find that whatever vesting plan Hayes may have discussed

with defendants' representative, it did not apply to the ownership of policyholder

---

[2] Citations to "Def. Exh." throughout this Opinion refer to the exhibits presented by
defendants at the evidentiary hearing.

information.[3]

The G.A. Contract outlines the duties of the agent.  Under Section 1.02 of that contract, Hayes had "no authority to make, modify or discharge any contract of insurance."  Def. Exh. C.  Under Section 1.06, his "authority to collect premiums" was limited to the "initial" premium and he had "no authority . . . to collect premiums for which . . . billing forms are sent from the Company to the premium payor."  Despite Hayes' testimony that the Agency had "had people pay premiums to the agency" at times, Docket No. 43 at 108, I find, based on the affidavit of Molly Akin, Ohio National's Senior Agency Auditor, that the general practice of Ohio National "agents like Hayes" was for premium notices to be "sent directly to the insured and typically remitted by the insured directly to Ohio National."  *See* Akin Affidavit ¶ 7 (Def. Exh. JJ).

To assist plaintiffs with discharging their duties and to help them comply with regulatory insurance laws, defendants provided plaintiffs with access to an online database called "ON-Net."  Plaintiffs entered into a user agreement (by clicking "accept" to clickthrough one of the registration screens on the computer) when they registered for ON-Net.  Based on testimony in court, I find that Hayes accepted the terms and conditions of the ON-Net user agreement.  *See* Def. Proposed Findings ¶¶ 49, 56-57

The user agreement stated that access to ON-Net would be terminated

---

[3] I also note that Hayes was probably referring to Section 8.06 of the C.A. Contract, which provides for a vesting plan in connection with renewal commissions, not policyholder information.  *See* Def. Exh. F.

"immediately" upon termination of the G.A. Contract, and it granted Ohio National the

right to terminate the user agreement at "any time." *See* Def. Exh. I.  Regarding property

rights, the user agreement provides:

> Policyholder information maintained by Ohio National and
> made available through ON-Net is proprietary information of
> Ohio National.   Unauthorized disclosure of proprietary
> information to any other person is prohibited.

*Id*.  Only Ohio National, and not Hayes, was authorized to, and did, input information into

ON-Net.  *See* Def. Proposed Findings ¶¶ 62-63.

Section 4.02 of the G.A. Contract provides that either party may terminate the

contract at will and without cause.  Ohio National notified Hayes on July 25, 2008 that

Ohio National was terminating the agency relationship.

Section 8.01(d) of the C.A. Contract provides that the C.A. Contract will be

terminated "on the last day of July in any Calendar Year if, by July 1 of the Calendar

Year, the Agent fails to meet the Semi-Annual Requirements described in Schedule

C200."  Def. Exh. F.  In a letter dated July 29, 2008, Ohio National notified Hayes II that

he was being terminated in accordance with Section 8.01(d) of the C.A. Contract.  *See*

Def. Exh. AE.  Plaintiffs presented no evidence to suggest that Hayes II had, in fact, met

his requirements.

Lastly, I find that defendants presented ample evidence showing that Hayes

replaced his clients' insurance policies without giving notice of replacement, even though

he was aware that Pennsylvania law required a notice of replacement and even after

6

defendants had requested that he cease this practice in a letter dated May 2, 2007.  *See* Def. Proposed Finds ¶¶ 75-76.


## II.  Procedural History

On August 5, 2005, plaintiffs sought a preliminary injunction *ex parte* against defendants in the Berks County Court of Common Pleas.  Judge John A. Bocabella granted plaintiffs an injunction that forbade defendants from using plaintiffs' customer information to solicit clients and/or sell them any insurance products, as well as from tortiously interfering with plaintiffs' relationships with their clients.  The injunction ordered defendants to (1) restore plaintiffs' access to ON-Net; (2) continue processing plaintiffs' pending applications; (3) continue providing status reports about plaintiffs' clients; and (4) disclose to plaintiffs the names of any of plaintiffs' clients that defendants had solicited.[4]

Despite being served with a copy of Judge Bocabella's order, Ohio National did not comply with the injunction.  Instead, invoking this court's diversity jurisdiction, defendants filed a notice of removal on August 7, 2008, along with a motion to dissolve the injunction.  On August 11, 2008, Ohio National further moved this court for a temporary restraining order.  On August 12, 2008, plaintiffs moved to remand.  I denied

---

[4] Defendants continue to challenge the validity of Judge Bocabella's order for a variety of reasons.  Because a settlement agreement, discussed *infra*, resolved entirely any disputes about that order, I will not address defendants' objections in this opinion.

the remand motion on August 19, 2008.

On August 27, 2008, this court held a hearing on issues of preliminary injunctive relief.  Subsequent to that hearing, and before I rendered a decision, the parties reached settlement, which was memorialized in a Stipulation, Partial Settlement Agreement and Order (the "Settlement Agreement") executed on September 12, 2008 and signed by this court thereafter.  That Settlement Agreement set out the parties' interim property rights to the policyholder information at issue.

Plaintiffs now ask this court to determine finally the respective property rights of the parties, including the right of access to and use of the customer information relating to persons who were owners of Ohio National policies and products whose original applications were taken by Hayes and/or Hayes II.  Pl. Br. at 3 (Docket No. 31, filed Dec. 8, 2008).  Defendants, in turn, ask this court to enter a permanent injunction that (1) orders plaintiffs to return all the policyholder information it possesses, including information obtained pursuant to the Settlement Agreement, and (2) permanently enjoins plaintiffs from seeking replacement of any Ohio National policyholders' policies.  The court held an evidentiary hearing on these issues on March 26, 2009.  *See* note 1, *supra*.

### III.  Conclusions of Law

Plaintiffs' request for a final determination of the rights of the parties in effect asks the court for an order directing which of the parties should turn over what information to whom, as well as how that information may, or may not, be used, and thus plaintiffs seek

relief akin to an injunction.  Accordingly, the court will treat both parties' claims as requests for a permanent injunction.  "It is well-settled that the power to grant a permanent injunction rests with the sound discretion of the trial court which may, in turn, grant a permanent injunction after a hearing if there are no material issues of fact and the issues of law have been correctly resolved."  *United States v. Richlyn Laboratories, Inc.,* 822 F. Supp. 268, 271 (E.D. Pa. 1993) (citations omitted).  "Permanent injunctive relief is appropriate if (1) plaintiff is successful in proving the merits of its case; (2) there is no available remedy at law; and (3) the balance of equities favors granting such relief."  *Id.* (citing *Ciba-Geigy Corp. v. Bolar Pharmaceutical Co.*, 747 F.2d 844, 850 (3d Cir. 1984)).

This court held an evidentiary hearing, and no material issues of fact remain; injunctive relief is therefore appropriate.  I conclude that the clear and unambiguous meaning of the contracts governing this dispute allocates the right to the policyholder information at issue to defendants.  I also conclude that, even if the contracts at issue were not clear and unambiguous, plaintiffs and defendants have not supplanted the common law of agency, which also allocates the right to the contested policyholder information to defendants.  Therefore, I will grant defendants relief by ordering that all policyholder information be returned to defendants and not used by plaintiffs henceforth.[5]

---

[5] Defendants have also alleged throughout this litigation that Hayes failed to comply with the insurance rules and regulations of both Ohio National and the Commonwealth of Pennsylvania, both of which Hayes was explicitly required to follow according to Sections 3.02 and 3.03 of the G.A. Contract.  Specifically, defendants claim that, *inter alia,* Hayes replaced annuities without providing the statutorily required notice to the annuity holder.  *See* 40 P.S. §

I will not, however, permanently enjoin plaintiffs from seeking, as a wholesale matter, replacement of Ohio National policyholders, so long as plaintiffs do not make use of Ohio National's proprietary information

*A. Ownership of the Policyholder Information*

1. The Contracts

Defendants urge that the dispute be governed by Ohio law, and plaintiffs do not challenge this view.  The Contracts contain a choice-of-law clause naming Ohio law as the law governing any dispute over the contracts.  *See* G.A. Contract § 5.05. Pennsylvania generally honors choice-of-law provisions within a contract.  *Nationwide Mut. Ins. Co. v. West,* 807 A.2d 916, 920 (Pa. Super. 2002).  Accordingly, I will apply Ohio law.

Under Ohio law, the rights to policyholder information can be "created under the common law of agency."  *Costanzo v. Nationwide Mut. Ins. Co.*, 832 N.E.2d 71, 76 (Ohio Ct. App. 2005) (citing *Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 323-24 (1992)).

---

625-29 ("When there is solicitation for the replacement of an existing life insurance policy or annuity with the same insurer or insurer group, the insurer shall, through its producers where appropriate, provide a 'Notice Regarding Replacement of Life Insurance and Annuities' in the form set forth under 31 Pa. Code Ch. 81 (relating to replacement of life insurance and annuities).").  As a result, defendants claim, they are entitled to relief on two further theories: (1) breach of contract, and (2) unclean hands.

Based on my findings of fact, I have concluded that plaintiffs did violate Pennsylvania insurance laws.  However, because defendants are entitled to the policyowner records for independent reasons, I need not, and will not, consider the implications of plaintiffs' alleged malfeasance in determining the rights of the parties to that information.

"[H]owever, an insurance company and its agent have the authority to supplant, by contract, the common-law rules governing their relationship."  *Id.* at 77 (citing *Fay v. Swicker,* 96 N.E.2d 196 (Ohio 1950)).

The court must assume that the language of any such contract expresses the parties' intent, and, if the language of the contract is clear and unambiguous, the court must give the contract language its ordinary meaning without reference to extrinsic evidence of intent.  *Id.*  Extrinsic evidence is only considered when either (1) the contractual language is unclear or ambiguous, or (2) "'the circumstances surrounding the agreement invest the language of the contract with a special meaning [such that] extrinsic evidence [should] be considered in an effort to give effect to the parties' intentions.'"  *Id.* (citing *Shifrin v. Forest City Ent., Inc.*, 597 N.E.2d 499 (Ohio 1992)).

The threshold question is whether the parties have entered into a contract that allocates the rights to the policyholder information at issue in this case.  On its face, the language of § 4.03 of the G.A. Contract and § 8.05 of the C.A. Contract is clear and unambiguous: under its terms, policyowner information belongs to the defendants.  Likewise, the unambiguous language of the ON-Net agreement establishes that information entered into ON-Net – which is the same type of policyholder information addressed by the G.A. Contract and the C.A. Contract – was defendants' property.  Thus, the ON-Net Agreement both grants the right to the policyholder information to defendants and reinforces the lack of ambiguity in the G.A. Contract and C.A. Contract.

Plaintiffs, however, argue that the "'policyowner records' referenced [in the

contracts] refers [*sic*] to the tangible items related to the 'policyowner records' rather than the intangible, macrocosmic concept known as 'expirations.'" Pl. Br. at 14. "Expirations," according to plaintiffs, represent a legal concept distinct from, and more encompassing than, mere policyholder records, and therefore, plaintiffs argue, the contracts do not resolve the issue of who has property rights to the policyholder information.[6]

> Plaintiffs define "expirations" as:
>
>> copies, electronically stored and otherwise, of the policy issued to the insured and/or records containing the date of the issuance of the insurance policy, the name(s) of the insured, the date of the policy's expiration, the amount of coverage, the premiums to be paid, the property covered, and all the other information procured during the term of the Hayes, Hayes II and/or Agency contract term with the Ohio National Defendants *and the exclusive right to use and control this customer information in soliciting renewals.*

Pl. Br. at 12 (emphasis added). The bulk of this definition refers to the records qua records, i.e., the policyholder information itself, and does not meaningfully differ from the term "policyowner records" contained in the Contracts. However, the last independent clause of plaintiffs' definition of an "expiration" also describes a substantive right to use the information contained in policyowner records. A substantive right of this

---

[6] Plaintiffs also emphasize that the ON-Net agreement only refers to "[p]olicyholder information maintained by Ohio National and made available through ON-Net." Thus, plaintiffs contend, because the agents are the ones who maintain and update the policyholder information and Ohio National (vis-a-vis ON-Net) merely stores and makes available that information online, the ON-Net agreement is ambiguous as to the property rights of the parties. Based on my findings of fact, however, it was actually defendants, and not plaintiffs, who maintained ON-Net. Thus, plaintiffs' argument as to ON-Net is a non-starter.

nature is not explicitly contained in the Contracts.

In order to confirm that the meaning of the Contracts is indeed clear and unambiguous, therefore, this court must resolve the significance, or lack thereof, of the absence of the term "expiration" in the Contracts.  Put differently, this court must determine whether the legal concept of "expirations" differs so meaningfully from the term "policyholder records" that this court, interpreting the Contracts, must conclude that the Contracts do not allocate any substantive rights of ownership over policyholder information.

The case plaintiffs directly cite for the proposition that an "expiration" encompasses a substantive right to use policyholder information is a 1964 decision by the Massachusetts Supreme Court, *White v. Universal Underwriters Insurance Co.*, 197 N.E. 2d 868, 871 (Mass. 1964).  *See* Pl. Br. at 12; Pr. Proposed Findings ¶ 108.  *White,* however, does not distinguish the term "expirations" from any other mechanism for referring to policyholder information and the right to make use of it.

The main case that plaintiffs rely on elsewhere, *V.L. Phillips & Co. v. Pennsylvania Threshermen, Etc.*, 199 F.2d 244 (4th Cir. 1952), held that an insurance company that was contractually required to turn over the "expirations" of its agent's clients could not use that information to continue soliciting renewals from those clients "without encroaching on the property right it gave to the [agent] under the Contract."  199 F.2d at 248.  The contract at issue in *V.L. Phillips*, however, stated explicitly that "the Agent's *use and control* of the expirations shall be deemed the property of the Agent and

13

left in his undisputed possession." *Id.* at 247.  That contract language, regardless of the term "expirations," created a substantive right in the agent.  Like *White*, therefore, *V.L. Philips* does nothing to establish that the term "expiration" encapsulates a substantive right distinct from the term "policyholder records."

The seminal Ohio case analyzing property rights over policyowner information, *Costanzo v. Nationwide Mut. Ins. Co.*, 832 N.E.2d 71 (Ohio Ct. App. 2005), lends no support to plaintiffs' contention.[7]   Plaintiffs have thus offered this court no persuasive authority that a contract must use the term "expiration," as distinct from the term "policyholder records" that appears in the Contracts, in order to allocate a substantive right to use policyholder information.[8]

Because the Contracts' failure to use the term "expirations" is of no legal consequence – that is, because there is no recognized legal distinction in Ohio law

───────────────

[7] Plaintiffs cite *Costanzo* in support of the claim that "Ohio state . . . courts recognize the importance and vitality of expirations."  Pl. Br. at 12.  In fact, *Costanzo* only uses the word "expiration" when stating that "'[p]olicyholder information . . . includes the date of a policy's expiration, the amount of coverage, the premiums to be paid, the property covered, and the other terms of an insurance policy.  It also includes a variety of personal information about the insured that would be difficult or costly to obtain by other means."  832 N.E.2d at 75.  In other words, under Ohio law, "policyholder information" appears to be the all-encompassing term, and the "expiration" is merely a constituent part – a date – of that policyholder information.

[8] Plaintiffs are correct that, in some cases where courts have held that express contractual language allocated ownership rights, the language allocating those rights was clearer than the language in the instant matter.  *See, e.g., V.L. Phillips,* 199 F.2d at 248; *Fred Miller Co. v. Empire Fire and Marine Ins. Co.*, 503 F.3d 751, 752 n.2 (8th Cir. 1974) (contract stating that "'the Agent's use and control of expirations shall remain the property of the Agent and be left in his undisputed possession'").  However, the existence of stronger language in other cases does not equal the proposition that such strong language is required to explicitly allocate property rights.  Indeed, there is no such language in the agreement that the *Costanzo* court, under Ohio law, deemed sufficiently explicit to allocate property rights.

between "expirations" and "policyowner records" – plaintiffs' argument that "[t]he Contracts do not contain any express provisions regarding the expirations in the event of the termination of any or all of the Contracts" is a red herring.  There is no question that the Contracts explicitly direct that plaintiffs must turn over all their clients' policyholder information to Ohio National.  Section 4.03 of the G.A. Contract directs that Hayes turn over the "policyowner records . . . and any *other property of the Company*."  The use of the word "other" in this clause clearly confirms that the policyowner records referred to are "property of the Company."  Based on the plain language of the Contracts, Ohio National owns that information.

Moreover, the language of the ON-Net agreement, regardless of whether it allocated the right to the policyholder information without more, at the very least reinforces Ohio National's claim to ownership.  In *Costanzo*, the Court of Appeals of Ohio held that a trial court did not err in concluding that a computer agreement – which resembled the ON-Net agreement in the instant matter – identified the insurance company as the owner of policyholder information.  *Costanzo* highlighted three "express declarations" in the computer agreement that, taken together, could allocate property rights: (1) that "policyholder data will remain the property of the Company;" (2) that the agent "agreed not to disclose . . . all policyholder information, in any form;" and (3) that "policyholder information and related documentation . . . are the property and proprietary to" the company.  832 N.E.2d at 78.  Similarly, the ON-Net agreement provides that policyholder information "made available through ON-Net is proprietary information of

Ohio National" and also prohibits "disclosure of proprietary information to any other person."  Given these similarities, and viewing the ON-Net agreement alongside the Contracts, it was clearly the intention of the parties to allocate the property rights over policyholder information to the defendants.

2.  The Agency Relationship

Even if the language of the Contracts did not clearly and unambiguously allocate defendants a property right over the contested policyholder information (which it does), defendants would still have a common law right to that information.

Under the common law of agency in Ohio, an agent is under a duty not to use confidential information that has been "'acquired by him during the course of or on account of his agency[,]'" including, specifically, "'written lists of names.'" *Id.* (quoting Restatement Second of Agency §§ 395-96).  Historically, courts applying this common law of agency held consistently that policyholder information "'belonged to the principal, the insurance company, and not to the agent.'"  *Id.*

However, this common law hales from an era when agents tended to act on the exclusive behalf of a single insurance company.  *Id.*  Now, in contrast, Ohio law recognizes two different methods of selling insurance: the exclusive-agency system and the American Agency system (also known as the "independent agency" system).  *Id.* "Independent agents may sell customers the policies of various insurance companies and typically have a property right in the policyholder information."  *Id.* (citing *Hedlund v.*

*Farmers Mut. Auto. Ins. Co.*, 139 F. Supp. 535, 537 (D. Minn. 1956)).  If plaintiffs'

relationship to defendants falls under the American Agency system, therefore, then

plaintiffs have, notwithstanding the Contracts, a claim to the property right to the

policyholder information in this case.  Otherwise, plaintiffs have a common law

relationship with defendants akin to that of an exclusive agent, and the property rights

belong to Ohio National.


a.

Plaintiffs are *not* the exclusive agents of Ohio National; at first blush, therefore,

plaintiffs would seem to fall under the American Agency System and therefore have a

common law property right over the policyholder data according to Ohio law as expressed

by *Costanzo*.  *Costanzo*, however, considered the question of the property rights of an

exclusive agent, not an independent one, and offered no lengthy discussion of the features

(other than non-exclusivity) of the American Agency system.

In contrast, *Hedlund* – the Minnesota case that *Costanzo* chiefly relies on –

discusses the characteristics of the American Agency system in greater detail.  In

*Hedlund*, a former agent of an automobile insurance company sued the company for

damages incurred by the insurance company's use of the "expirations" of policies the

agent had sold prior to the agent's termination.  *Hedlund* held that the agent was not

entitled to damages because he was not operating under the American Agency system.

*Hedlund* explained, in detail, the nature of the American Agency system:

> [T]he property rights which are protected by the courts in these
> cases [finding that an agency relationship falls under the
> American Agency system] are ones which originate under stock
> insurance company dealings with its agents – or something
> similar to it – especially in the fire insurance field. Under such
> circumstances the insurance company has no direct contact with
> the insured; the policy is issued by the agent and countersigned
> by him; the agent has the power to cancel or amend the policy;
> he collects the premiums and makes remittance on his own to
> the company; he may switch companies upon the expiration of
> the policy or he may cancel it during its term and place the risk
> in another company. Under such a relationship the agent is an
> independent contractor and possesses a property right in the
> expirations which he may sell or which may be the subject of
> disposition upon death.

139 F. Supp. at 537.  *Hedlund* held that, in contrast to an American Agency relationship, a

contractual relationship "falls into a different category" under the following

circumstances:

> The defendant is a mutual insurance company. It is owned by its
> policy holders. The agent occupies a different position than he
> does in the traditional stock insurance company-agent
> relationship. The policy is issued directly by the insurance
> company and not by the agent. The agent has no authority to
> cancel it; he usually does not collect the premiums; the policy is
> written on a continuous basis, and each 6 months the company
> bills the insured directly for future premium, and, upon payment,
> sends a 'continuation certificate' directly to the insured. Upon
> payment of the renewal premium, the agent receives a renewal
> commission of from 8 to 10 per cent from the company.
>
> The practice of defendant company upon the termination of its
> relationship with an agent was to assign the business of the
> former agent to some other agent for servicing. Upon the
> renewal of the policy, the new agent performing the service
> received the renewal commission.

*Id.*  As a result, the plaintiff in *Hedlund* "did not possess a property right of the kind

18

protected by the cases" finding that the agent was operating under the American Agency system. *Id.*

The relationship between plaintiffs and defendants in the instant matter largely resembles the relationship between the parties in *Hedlund*. Ohio National is a mutual insurance company owned by its policy holders. Its policies and annuities are not subject to cancellation. The Company, and not the agent, issues the policy, and the agent then provides a copy to the policyholder. Like the agent in *Hedlund,* as a general agent, Hayes had "no authority to make, modify or discharge any contract of insurance." G.A. Contract § 1.02. His "authority to collect premiums" was limited to the "initial" premium and he had "no authority . . . to collect premiums for which . . . billing forms are sent from the Company to the premium payor." G.A. Contract § 1.05. After the initial premium, Ohio National's practice was to send premium notices directly to the insured and for the insured to remit those premiums directly to Ohio National. Finally, and perhaps most tellingly, Ohio National, like the defendant in *Hedlund*, reassigned clients of terminated agents to other Ohio National agents for servicing (i.e. both agency arrangements provided for the "orphaning" of a terminated agent's policyholders). Under *Hedlund*, therefore, the agency relationship between the parties in the instant matter is not a representative example of the American Agency system, and defendants are entitled to ownership of the policyholder information.

b.

19

Plaintiffs, however, present a different picture of the American Agency System than that described in *Hedlund*.  Relying on *In re Roy A. Dart Ins. Agency, Inc.*, 5 B.R. 207, 209-10 (Mass. Dist. Ct. 1980), plaintiffs describe the American Agency system as being characterized by agents who are not exclusively bound to a single insurance company; pay their own overhead expenses; collect premiums and remit payments to the company, with the agent bearing the risk of non-payment; and have contact with the insured, unlike the insurance company, which has little or no such contact.  Pl. Br. at 16-17.

Plaintiffs contend that, in the instant matter, "the American Agency system is embodied in and part of the contractual rights and obligations which are expressly stated in the Contracts because included in the Contracts are customary provisions adopting the American Agency System."  Pl. Br. at 18.  Plaintiffs point to the following relevant contractual provisions: (a) Section 3.01 of the G.A. Contract and Section VII.A of the Rep. Agreement both designate Hayes as an "independent contractor"; (b) Section 1.01(b) of the G.A. Contract charges Hayes with a litany of responsibilities, including soliciting, delivering in person, and servicing policies, as well as collecting the initial premium payment; (c) Section 1.09 of the G.A. Contract makes Hayes responsible for paying his own sub-agents; (d) plaintiffs' compensation is based on premiums and commissions; (e) under Section VII.B of the Rep. Agreement, Hayes is solely responsible for his own marketing efforts; and (f) under Sections I and III of the Rep. Agreement, Hayes is authorized to solicit and remit applications for the purchase of the securities and also to

20

remit payments for the purchase of those securities.  Hayes testified that, when working

on Ohio National policies, he paid "one hundred percent" of his own expenses; solicited

his own business; was considered an "independent contractor;" collected payments and

remitted them to Ohio National; and answered questions from customers.  *Id.* at 25-26.

Under plaintiffs' definition of the American Agency system – unlike under

*Hedlund's* – Hayes does appear to qualify as an "independent agent" who is entitled to the

property rights over his clients' policyholder information because Hayes was not an

exclusive agent of Ohio National and because he was charged with significant

independent responsibilities.[9]  However, as defendants argue, this court should follow

*Hedlund* because the line of cases relied on by plaintiffs – including *In re Roy A. Dart* –

arise in the particular context of fire and casualty insurance, which are renewable policies

that are cancellable each year.  Def. Br. at 19.[10]  *See Hedlund,* 139 F. Supp. at 535

(observing that those cases protecting an insurance agent's property rights by reference to

the American Agency System "originate under stock insurance company dealings with its

---

[9] However, plaintiffs conveniently neglect to mention the court's statement in *In re Roy A. Dart* that, in an American Agency system relationship, "[a]t least until non-payment, the insurance company scrupulously avoids direct contact with the insured by sending all billings, endorsements, and other communications to the agent and not to the insured." 5 B.R. at 209-10. In the instant matter, defendants directly sent billings to customers; furthermore, the company tended to collect premiums after the initial one, and there is no evidence that plaintiffs bore the risk of non-payment of a policy.  Thus, even if I were to accept plaintiffs' portrayal of the American Agency system – which I do not – I would still find that the instant case falls short of qualifying as an example.

[10] Although they had the opportunity to do so, plaintiffs do not address this distinction in their reply brief.

agents . . . especially in the fire insurance field").  In contrast, Ohio National, like the defendant in *Hedlund*, is a mutual (i.e. policyholder-owned) insurance company that offers non-cancellable policies.

Because *Hedlund* most directly resembles the instant factual scenario, and also because it is the principal case relied upon by *Costanzo*, it, and not any of the cases cited by plaintiffs, is most apposite.  Moreover, as a matter of policy, a mutual insurance company like Ohio National should retain the rights to its policyholders' information because that information represents the personal information of the owners of the company itself. Meanwhile, unlike in the context of a fire insurance policy that requires an optional annual renewal, Ohio National's non-cancellable policies may last many years and continue to pay plaintiffs' commissions for the duration of the policies, thereby not leaving plaintiffs empty-handed.  A verdict for defendants thus aligns with considerations of fairness as well.

Lastly, it merits further mention that, as defendants note, the entire concept of orphaned policies presupposes a contractual relationship in which an agent relinquishes a claim to clients upon the termination of that agent's contractual relationship with an insurance company.  Hayes received approximately 2,500 orphaned clients.  It strains reason to accept that Hayes, who was so intimately familiar with Ohio National's custom and practice of reassigning orphan clients, really believed himself to be entitled to the very policyholder information that defendants routinely passed on from former agents to him as an orphan's new agent.

22

B.  *Injunctive Relief*

The foregoing analysis demonstrates that defendants, and not plaintiffs, are the

owners of the Agency's policyholders' customer information, and thus defendants have

satisfied the first requirement for this court to issue a permanent injunction.  Because no

remedy at law exists to vindicate defendants' property rights, the second element required

for the issuance of a permanent injunction has also been satisfied, and plaintiffs must turn

over that information to defendants.  Plaintiffs must also cease to use that information in

any capacity.  Equitable relief of this nature is the only way to vindicate defendants'

success on the merits, and, as plaintiffs have no rights to the policyholder information, the

balance of equities – the third, and final, consideration relevant to any determination of

permanent injunctive relief – favors ordering plaintiffs to turn over all customer

information and not make use of any information they may otherwise know.

However, the balance of equities in this case does not support going so far as to

restrain plaintiffs from any and all business contact with their former clients.  Virtually all

of the Agency's insurance business consists of Ohio National policyholder clients.

Defendants argue that plaintiffs' unlawful insurance replacement practices justify

stripping them of the right to deal with those clients.  Plaintiffs, however, are not on trial

for unlawful insurance practices; if anything, it is punishment enough for those practices

that they will no longer be able to sell Ohio National policies or use their former clients'

policyholder data.  To entirely foreclose plaintiffs from conducting any business with

their former clients might completely destroy their business.  Moreover, the contract between the parties does not contain a non-compete clause.  Therefore the parties appear to have anticipated competition upon termination of the agency agreement.  Although the policyholder data may belong to Ohio National, plaintiffs ought not be prohibited from all attempts to retain, or resume connection with, their former clients.

Thus, because defendants' property rights can be vindicated without a wholesale ban on plaintiffs replacing their former clients' policies, this court will not entirely enjoin plaintiffs from doing so.  That said, should plaintiffs attempt to do business with their former clients, they may not make any use of policyholder data or information.  Instead, they must turn over that information to defendants immediately.  An appropriate order accompanies this opinion.